UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Benefit Resource, Inc.,

       Plaintiff,

v.                                                                          Civ. No. 07-4199 (JNE/FLN)
                                                                            ORDER

Apprize Technology Solutions, Inc.,
David Reid, and Courtney Guertin,

       Defendants.

_____

Seth J.S. Leventhal, Esq., and Surya Saxena, Esq., Dorsey & Whitney LLP, appeared for
Plaintiff Benefit Resource, Inc.

Gregory E. Karpenko, Esq., and Laura L. Myers, Esq., Fredrikson & Byron, PA, appeared for
Defendants Apprize Technology Solutions, Inc., David Reid, and Courtney Guertin.

_____

Benefit Resource, Inc., (BRI) brings this action against Apprize Technology Solutions,

Inc. (Apprize); Apprize's founder, David Reid; and Courtney Guertin, a former employee of BRI

and a current employee of Apprize.  BRI asserts claims for misappropriation of trade secrets,

breach of contract, Lanham Act violations, tortious interference with contract, business

defamation, and unjust enrichment.  The claims arise from the termination of the business

relationship between BRI and Apprize, the creation of a new product by Apprize that will

compete with a product that Apprize formerly marketed for BRI, and employment of Guertin by

Apprize after he was previously employed by BRI.

The case is before the Court on BRI's motion for a preliminary injunction.  BRI seeks to

enjoin Apprize and Reid from continuing to employ Guertin and to enjoin all the defendants

from disparaging or defaming BRI's business, using BRI's trade secrets and confidential

information, and marketing or distributing software related to management of employee benefits

information or to enrollment in or administration of employee benefits plans.  In addition, BRI

seeks the return of all copies of its confidential information and trade secrets and requests that

the defendants be required to issue a "corrective disclosure" to all of BRI's and Apprize's

customers in order to remedy allegedly misleading communications previously issued by the

defendants.  For the reasons stated below, the Court denies BRI's motion.

## I.  BACKGROUND

### A.      BRI's UBenefit product

BRI owns a Customer Relationship Management (CRM) software product known as

UBenefit.  UBenefit allows a variety of personal information about employees to be submitted

by an employer or an insurance broker to an online database.  This data can then be easily

organized and used in a variety of ways without the need for repetitive reentry or labor-intensive

reorganization.  Significantly, UBenefit facilitates both small- and large-group health insurance

enrollments, allowing insurance brokers to submit an employer's personnel information to

multiple group insurance providers in order to receive rate quotes without the need to fill out

multiple forms.  Other functions of UBenefit include administration of benefit plans and

expedited completion of I-9 and W-4 forms for new employees.

Users access UBenefit through customizable websites known as "portals."  Separate

portals may be assigned to individual employers or insurance brokers, and these portals may be

customized, or "branded," to fit a user's needs or preferences.  BRI charges a monthly fee to

insurance brokers who offer UBenefit services, and BRI also charges brokers or employers a set

amount for each employee record created in the UBenefit database.

To create UBenefit, BRI obtained health insurance enrollment forms from various

insurance providers and synthesized them into a single online questionnaire.  When the UBenefit

questionnaire is filled out, the information is "mapped" onto each individual provider's form for

the provider's use.  BRI had to obtain the approval of the insurance providers before they would

accept information submitted via UBenefit, a process that, according to the affidavit of BRI's

president, involved testing of accuracy and security and took substantial time and resources.  In

all, UBenefit took nearly three years to create.

**B.      Reid and Apprize**

In 1997, Reid created an off-line group insurance rate quoting system that allowed

brokers to enter and organize information in a variety of ways.  In 2001, Reid began marketing

online large-group health insurance enrollment services through a software program known as

Benefits Connect, which was developed by a third party.  Reid founded Apprize in early 2005,

and Apprize has since offered a variety of technological products to group health insurance

brokers and the employee benefits market.

**C.      The relationship between BRI and Apprize**

In March 2005, BRI hired Apprize to market UBenefit to insurance brokers as a

"reseller."  Under this arrangement, Apprize received access to a UBenefit portal that was

customized for Apprize's use in marketing UBenefit, and Apprize sold access to UBenefit for an

elevated fee, remitted the normal access fee to BRI, and kept the difference.  Apprize continued

to use other products to enroll and manage other types of insurance, for example, dental and

disability insurance, and it continued to market Benefits Connect.

Pursuant to Apprize's use of UBenefit, Apprize accepted the terms of BRI's User Access

Agreement.  This agreement gave BRI the authority to modify its terms and conditions by

posting the new terms on the UBenefit website, and it provided that Apprize would be deemed to

accept the new terms and conditions if it continued to access or use the site.  The initial

agreement did not limit Apprize's ability to compete with BRI, though it did state that the

UBenefit "site is proprietary to BRI and is protected by intellectual property laws" and that "[a]ll

use of BRI and/or UBenefitTM not expressly permitted hereunder is prohibited."  No version of

the agreement, however, appears to have included any express statement of permitted uses.  In

January 2007, BRI modified the agreement to add the following passage to the "licenses and

access" paragraph:

> You may not provide directly or indirectly any verbal, written or visual
> demonstration of your co-branded BRI portal site or provide access to your co-
> branded BRI portal site except to your clients and prospects who are not, to the
> best of your knowledge, competitors of BRI.  The co-branded BRI portal site shall
> be deemed at all times to be confidential information.

According to Reid's affidavit, after UBenefit was added to Apprize's product offerings,

BRI asked Apprize to aid in the development and support of the UBenefit product.  As a result,

Reid claims he met regularly with Guertin, and he asserts that BRI's owners instructed

UBenefit's software programmers to defer to Apprize and Reid for development ideas.

According to Reid, many of UBenefit's current features were added to UBenefit at Apprize's

request.  For example, Reid claims that UBenefit's benefits calculator and sub-portal "branding"

were suggested by Apprize.  In addition, Reid claims that BRI did not provide training materials

for UBenefit, leading Apprize to develop and distribute training materials for UBenefit on its

own.

Reid claims that, in the fall of 2006, performance problems with UBenefit's secondary

features and concerns about the security of the data entered into UBenefit, among other things,

prompted Apprize to seek renegotiation of its agreement with BRI.  When Apprize's concerns

were not addressed to its satisfaction, Apprize notified BRI that it would stop marketing

UBenefit to new customers and start exploring alternatives to UBenefit.  Reid claims that, at this

time, he began to design a CRM program that became E.A.S.E., also known as EnrollE.A.S.E.,
an online large- and small-group health insurance enrollment program that lacks some of
UBenefit's secondary functions.

Apprize first released a version of the E.A.S.E. product in August 2007.  BRI claims it
had no notice that Apprize planned to release such a product, and the parties dispute the degree
of similarity between E.A.S.E. and UBenefit.

**D.    Guertin's employment history**

Guertin was hired by BRI on or about June 5, 2002, and Guertin signed an employment
agreement with BRI at that time.  This agreement specified that the term of Guertin's
employment was to be two years and required a "mutual written agreement" to extend that term.
Guertin's employment agreement protected BRI's trade secrets and confidential information with
the following language:[1]

> Employee shall at all times during the term of Employee's employment and
> thereafter hold in strictest confidence, and not use or disclose to any person, firm
> or corporation, except for the exclusive benefit of the Company as required by
> Employee's duties hereunder, any trade secrets, confidential knowledge, data or
> other proprietary information of the Company.  By way of illustration and not
> limitation, such trade secrets, confidential knowledge, data or other proprietary
> information shall include information relating to products, processes, know-how,
> designs, formulas, methods, samples, developmental or experimental work,
> improvements, discoveries, plans for research, new products, marketing and
> selling, business plans, budgets and unpublished financial statements, licenses,
> prices and costs, the identity of suppliers and customers and the nature of the
> Company's relationship with such suppliers and customers, and information
> regarding the skills and compensation of other employees of the Company.

Guertin worked for BRI as a software developer and later as Chief Technology Officer.

Throughout his time with BRI, Guertin was responsible for the development of UBenefit and

---

[1]    Guertin's employment agreement also contained a clause preventing Guertin from
working for a BRI competitor for a six-month period following the end of Guertin's
employment.  BRI's breach of contract claims do not involve this noncompete clause.

other applications necessary to implement and use UBenefit and its portal infrastructure.  Guertin was responsible for writing substantially all of UBenefit's source code and designing the user interface.  Guertin was informed of changes to the online questionnaires that were requested by users, and he had access to BRI's customer lists.  Accordingly, Guertin was privy to all of BRI's confidential information regarding UBenefit.  Despite the two-year term specified in Guertin's employment agreement, Guertin worked full-time for BRI until on or about Nov. 15, 2006, and thereafter Guertin remained a consultant for BRI until approximately Sept. 13, 2007.

According to Guertin's affidavit, Reid asked Guertin to review a proposal to code E.A.S.E. for Apprize.  Guertin indicated that he was interested in working with Apprize, and he began serving as an independent contractor with Apprize in May 2007, at which time he became responsible for completion of the source code for the E.A.S.E. product.  Apprize hired Guertin as an employee on September 1, 2007.  Guertin asserts that he did not use any source code from UBenefit or any other BRI confidential information to create the code for the design developed by Reid for E.A.S.E.  He claims he used only his individual programming skills, general principles of coding, and information readily available to those involved in the technology industry.

**E.      Apprize terminates its relationship with BRI**

According to Reid's affidavit, BRI's president confirmed to Apprize in early September 2007 that BRI had disclosed or would disclose certain information to Medica.  Reid asserts that these disclosures violated Apprize's confidentiality obligations to its customers, and he claims that Apprize had instructed BRI not to make these disclosures.  While the parties disagree over the timing and nature of Apprize's objections, BRI admits that it disclosed to Medica "the broker names and addresses, as well as the insurance providers for which the broker has done

6

enrollments through UBenefit" and "the number of employees the broker has enrolled in

UBenefit."  BRI claims that UBenefit customers in Illinois were not subject to these disclosures.

On September 12, 2007, Reid, on behalf of Apprize, sent an email to Apprize's customers

that were using UBenefit.  In relevant part, that email states:

> Subject: UBenefit Portal Closing
> Apprize Technology has established certain product requirements that must be present in order for us to fulfill our commitments to you.  Perhaps the single, most important factor in our mission is to recognize the confidential and sensitive nature of the information we are entrusted to protect.
> On September 10th we were informed that Ubenefit will begin reporting to Medica (a Minnesota HMO) the following information:
> - The name of every broker in the UBenefit system.
> - The name, address and number of employees of every employer and the broker to which that case is associated.
> - The carriers to which applications are being submitted for every case and the effective dates requested.
> As a result of this event, and the overwhelming consensus from our users that this is unacceptable, we have decided to terminate our relationship with Ubenefit and we will be closing our portal effective 11/1/07.  We have posted information on how to avoid disruptions and will continually update this page on our website at:  [Apprize internet address]
> We apologize for any disruption this may cause.  Under the Apprize business model, we believe data confidentiality is of the utmost concern.  Please contact me . . . with any questions or concerns and please check our site regularly for updates.

The internet address in Reid's September 12 email led to a webpage[2] that stated:

> - Access to the Ubenefit portal through Apprize Technology will end completely on 11/1/07.  You should complete any enrollments in progress prior to that date.  We would recommend that you save or download any needed information from the portal prior to that time.
> - We have Requested that Ubenefit deliver all data in the system on 11/1/07.  As soon as we receive the information we will make it available to you.  If you choose, you can re-establish your portal directly with Ubenefit at that time.  The speed and cost of providing this data will be determined when

---

[2]     The parties appear to have supplied two different versions of this webpage.  One version is transcribed in the text of this Order.  The second version appears to contain additional language about Apprize's intention to transfer data that had been entered into UBenefit into E.A.S.E, but the language is not entirely clear because the photocopy submitted to the Court omits the words near the left margin of the webpage.

we know the format in which it will be provided.  If Ubenefit can provide the data separated by broker at no cost, we will make it available to you immediately at no cost.  As we learn more about the Ubenefit data release, we will keep you informed.

Apprize sent another email mentioning the closure of the UBenefit portal on October 30, 2007.  The October 30 email states:

Subject: Important Apprize Update
**Apprize Technology's Ubenefit Portal**
As a reminder, Apprize Technology is terminating its relationship with Ubenefit effective 11/1/07.  All access to Ubenefit through Apprize Technology's portal will end as of that date.  Apprize Technology will not have access to the site as of that date.  Any questions you have about Ubenefit usage after 11/1/07 should be directed to Ubenefit.  Contact information is available at the Ubenefit website located at [UBenefit internet address].
All other products and services of Apprize Technology are 'Business as Usual' including:
**Full Service Online Enrollment**
Apprize Technology's Full Service Online enrollment is having a record setting year.  Our Full Service Online enrollment solution is ideal for providing groups of 200 and up a completely paperless and automated benefit administration solution.  With full service, Apprize Technology handles all the set-up, client support and training, and ongoing enrollment movement.
**Agency Management**
Apprize Technology's Client Relationship Management system.  For over 10 years, agents have used our system to manage their clients, prospects, commission accounting, rate quoting and just about everything else related to servicing existing customers and tracking prospects.
**Rate Quoting**
Beginning with the 1/1/08 quarter, we have enhanced our quoting system.  Your subscription will now include access to new features that will make assembling quotes even easier.  Our next update will have instructions and details on how to take advantage of these upcoming enhancements.
**E.A.S.E.**
The simplest and fastest way to build your client a benefits website to handle both enrollment and communication needs.  E.A.S.E. provides a fast solution to eliminate handing out multiple forms, distributing documents, managing simple enrollment events and creating a company library.
For more information about our products and services, visit our website [Apprize internet address].

BRI claims that Reid's communications caused confusion among UBenefit users.

According to the affidavit of BRI's director of sales and marketing, several UBenefit users mistakenly believed that their access to UBenefit would end on November 1 and that the disclosures to Medica had included enrollee demographic information or were otherwise "improper."  The director of sales and marketing further indicated that several UBenefit users in Illinois received Reid's communications and mistakenly believed that their information had been disclosed to Medica.  More generally, BRI asserts that UBenefit users were unaware of the existence of BRI or believed that Apprize owned UBenefit.

Apprize's UBenefit portal was closed at Apprize's request on November 1, 2007.  BRI claims that, at some point before November 1, one or more UBenefit users had been diverted to Apprize's E.A.S.E. product when they tried to access UBenefit through Apprize's reseller portal. Reid asserts that Apprize did not have the ability to redirect customers from the UBenefit portal, and he claims that customers attempting to access UBenefit after November 1 were sent to a website prepared by BRI that featured instructions on how to continue using UBenefit. According to Reid, that website stated:

> As you are aware, at the request of Apprize Technology Solutions, Inc., their UBenefit[tm] portal has been turned off effective November 1, 2007.
> However, if you would like to continue to use UBenefit and work directly with us, please contact us at [UBenefit email address] and advise us to reopen your portal.  Also, please forward any questions you may have to the same email address and we will contact you.
> We apologize for any inconvenience that you may have experienced as a result of this decision by Apprize Technology and we want to assure you that your service will be restored at your request.

The affidavit of BRI's president states that BRI has lost customers due to the launch of E.A.S.E., which BRI contends was created with the use of BRI's trade secrets and confidential information, and due to allegedly false and misleading statements in Reid's communications to UBenefit users.  As a result, BRI filed the present action alleging misappropriation of trade

secrets, breach of contract, Lanham Act violations, tortious interference with contract, business

defamation, and unjust enrichment.[3]  BRI moved for a preliminary injunction, seeking, among

other things, to require the defendants to cease using or marketing E.A.S.E, to cease making

disparaging statements about UBenefit, and to issue a "corrective disclosure" to remedy the

allegedly false or misleading statements.

## II.  DISCUSSION

To determine whether to grant a motion for injunctive relief, a court must consider: (1) the

movant's likelihood of success on the merits; (2) the threat of irreparable harm absent the

injunction; (3) the balance between this harm and the harm experienced by other parties if the

injunction issues; and (4) the public interest.  *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109,

113 (8th Cir. 1981).  Injunctive relief is an extraordinary remedy, *see Calvin Klein Cosmetics

Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987), and the party requesting

the injunction bears the "complete burden" of proving they are entitled to such relief, *Gelco

Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).  While no one factor is

determinative, likelihood of success on the merits is generally the touchstone inquiry.

*Dataphase*, 640 F.2d at 113.

## A.      Likelihood of success on the merits

### 1.      *Misappropriation of trade secrets*

BRI claims that the defendants have misappropriated BRI's trade secrets in violation of

the Minnesota Uniform Trade Secrets Act (MUTSA).  MUTSA states that both actual and

---

[3]        In addition, Apprize filed a state court action to recover the data entered into UBenefit by its customer brokers.  The parties have agreed to stay that case pending the outcome of this lawsuit.

threatened misappropriation of trade secrets may be enjoined. Minn. Stat. § 325C.02(a) (2006).

Under MUTSA, a "trade secret" is:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 325C.01, subd. 5 (2006). MUTSA defines "misappropriation" as:

> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who
>> (A) used improper means to acquire knowledge of the trade secret; or
>> (B) at the time of disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was
>>> (I) derived from or through a person who had utilized improper means to acquire it;
>>> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>> (C) before a material change of the discloser's or user's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 325C.01, subd. 3.

Though BRI identified many trade secrets in its memoranda, at the hearing it focused its argument on two trade secrets: the methods by which UBenefit's features are implemented and UBenefit's source code.[4] The parties do not dispute that this information has value, and BRI

---

[4]     The additional trade secrets identified by BRI in its memoranda include BRI's business practices, business methods, strategic plans, hardware configurations, knowledge of benefit-enrollment practices, confidential customer lists, and knowledge of "what not to do" in connection with developing and offering CRM software; and UBenefit's portal infrastructure, mapping capability, dynamically updating questionnaires, user interfaces, security protocols,

claims that it made reasonable efforts to protect this information by marking the UBenefit source code and other documents with proprietary notices, requiring employees to enter into confidentiality and noncompete agreements, and requiring UBenefit users to enter into User Access Agreements.  The Court concludes that BRI has demonstrated some likelihood of success in demonstrating that these two classes of information constitute trade secrets.  *Cf. Jostens, Inc. v. Nat'l Computer Sys., Inc.*, 318 N.W.2d 691, 698 (Minn. 1982) (indicating that computer software may constitute a trade secret).

Regarding misappropriation by the defendants, BRI argues that it is entitled to an inference of misappropriation based on Guertin's involvement in creation of E.A.S.E, the similarities between UBenefit and E.A.S.E., E.A.S.E.'s short development time, and the absence of evidence of independent development.  *See Wyeth v. Natural Biologics, Inc.*, 395 F.3d 897, 900 (8th Cir. 2005) ("In some instances, [a trade] secret is so unique that the emergence of a similar, slightly altered product gives rise to an inference of misappropriation.").  The Court concludes that BRI has not established a strong likelihood that it will succeed in demonstrating misappropriation.  *Cf. id.* (affirming judgment for plaintiff on misappropriation claim where defendant communicated with plaintiff's former chemist for over a year, plaintiff's process for producing estrogens had not previously been duplicated by any competitor, defendant possessed "questionable ability" to develop the process on its own, and defendant's process was similar or

---

scripting processes, and other features, plus their combination in the UBenefit product.  As relates to these additional purported trade secrets, the Court concludes that BRI has demonstrated little likelihood of success on the merits of its misappropriation claims because they do not appear to be confidential or, alternatively, to be identified with the requisite specificity.  *See Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 898 (Minn. 1983) (indicating that trade secrets must be identified with specificity so that they may be distinguished from other information that may be properly used in legitimate market competition); *Jostens, Inc. v. Nat'l Computer Sys., Inc.*, 318 N.W.2d 691, 699 (Minn. 1982) ("Simply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status.").

identical to plaintiff's process).  The involvement of Guertin, who was privy to the source code

of UBenefit, in the creation of a competing product is suspicious, but other considerations

militate against the inference BRI seeks.  *Cf. IBM Corp. v. Seagate Tech. Inc.*, 941 F. Supp. 98,

101 (D. Minn. 1992) ("Merely possessing trade secrets and holding a comparable position with a

competitor does not justify an injunction.  A claim of trade secret misappropriation should not

act as an ex post facto covenant not to compete.").  For example, E.A.S.E. and UBenefit are not

identical products, as E.A.S.E. performs significantly fewer functions, and E.A.S.E. and

UBenefit are coded in different programming languages.  Some of the similarities between the

two products are dictated by the contents of insurance carrier forms, and the functions that

E.A.S.E. and UBenefit share are not entirely unique, as the defendants have supplied evidence

that many of UBenefit's features exist in other CRM products and that other CRM products have

mapped the relevant insurance forms.  There is evidence, though disputed by BRI, that Reid has

at least some experience relevant to developing CRM products.  Moreover, Guertin's claim to

have been involved only in the coding, not the design, of E.A.S.E. is corroborated by evidence of

another bid on the E.A.S.E. coding project that tends to indicate that E.A.S.E. was not coded in

an inordinately short period of time.

>    2.    *Breach of contract*

BRI argues that Guertin has breached the portions of his employment agreement that

prohibit him from using or disclosing BRI's trade secrets and confidential information.  BRI also

asserts that Reid, Apprize, and Guertin have breached the portions of the User Access Agreement

labeling the UBenefit portal sites "confidential information" and stating that the sites are

"proprietary to BRI and . . . protected by intellectual property laws."[5]  As with its claim for

misappropriation of trade secrets, BRI contends that the Court should infer that the defendants

have breached their contracts.  *Cf. Eaton Corp. v. Giere*, 971 F.2d 136, 140 (8th Cir. 1992)

(affirming summary judgment for the plaintiff on claim for breach of employment agreement

protecting plaintiff's confidential information where "the design and specifications for

[defendant's] device were obviously direct results from his work [with plaintiff]").

The Court concludes that BRI has not established a strong likelihood of success on the

merits of its breach of contract claims.  As with BRI's misappropriation of trade secrets claims,

the Court concludes that Guertin's involvement to the production of E.A.S.E. is suspicious but

that countervailing evidence suggests E.A.S.E. may have been produced without the use of

BRI's confidential information.  In addition, the scope of the defendants' duties under the User

Access Agreement to protect BRI's confidential information is not readily apparent.  For

example, the relevant provisions apply only to UBenefit "sites."  Moreover, there is evidence

indicating that Apprize and Reid were invited to partake in the development of the UBenefit

product.  There appears to be no contractual language governing ownership of any improvements

that were suggested by Apprize and Reid, and no language appears to explicitly protect

confidential information that Apprize and Reid encountered while participating in development

of UBenefit.

---

[5]     BRI also alleges that the defendants violated aspects of the User Access Agreement that
purportedly prohibit the defendants from using BRI's trade secrets, know-how, or intellectual
property for a competitive purpose.  However, BRI fails to identify the relevant language in the
agreement.  The only language in the agreement referencing competition is the passage, added in
January 2007, that states that the defendants "may not provide directly or indirectly any verbal,
written or visual demonstration of your co-branded BRI portal site or provide access to your co-
branded BRI portal site except to your clients and prospects who are not, to the best of your
knowledge, competitors of BRI."  BRI does not allege that the defendants marketed UBenefit to
BRI's competitors, and this language does not prevent the defendants from engaging in
competitive behavior.

3.      *Lanham Act violation*

a.      False advertising

BRI claims that the defendants engaged in false advertising in violation of the Lanham

Act by sending an email to UBenefit users that falsely stated that the Apprize UBenefit portal

was closing and that BRI made improper disclosures regarding all UBenefit users to Medica.  In

addition, BRI argues that even if the statements on these topics in the email were literally true,

they are actionable because they have a tendency to deceive or mislead.

> To establish a claim under the false or deceptive advertising prong of the Lanham
> Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a
> commercial advertisement about its own or another's product; (2) the statement
> actually deceived or has the tendency to deceive a substantial segment of its
> audience; (3) the deception is material, in that it is likely to influence the
> purchasing decision; (4) the defendant caused its false statement to enter interstate
> commerce; and (5) the plaintiff has been or is likely to be injured as a result of the
> false statement, either by direct diversion of sales from itself to defendant or by a
> loss of goodwill associated with its products.

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998); *see* 15 U.S.C. 1125(a)

(2000).  Under the first element, a statement is false if it is either literally false as a factual matter

or it is literally true or ambiguous but implicitly conveys a false impression, is misleading in

context, or is likely to deceive consumers."  *United Indus. Corp.*, 140 F.3d at 1180.  If a claim is

literally false, actual consumer confusion need not be proved.  *Id.*

Reid's September 12 email arguably indicated that all insurance brokers using UBenefit

were subject to the disclosures to Medica.  It appears that some of the email recipients were

UBenefit users in Illinois that were not included in the disclosures.  Assuming the September 12

email was false or misleading in this regard, BRI has not established a likelihood that it can

demonstrate that any deception was material.  *See Johnson & Johnson Vision Care, Inc. v. 1-800*

*Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002). ("The plaintiff must establish materiality

even when a . . . court finds that the defendant's advertisement is literally false."). Had the September 12 email more clearly identified which brokers were subject to the disclosures, it would still have revealed UBenefit's disclosures to Medica. This revelation would have cast doubt on the security of data related to even those brokers not subject to the disclosures. As a result, it is unclear whether the effect of a more precise email would have been different than the effect of the email Reid actually sent. The Court concludes that BRI has not established that it is likely to prove that any other statement by the defendants was false or misleading, and consequently the Court concludes that BRI has not demonstrated a likelihood of success on its false advertising claims.

Additionally, the Court notes that an injunction prohibiting future false or misleading statements by the defendants is not warranted because BRI has not shown that any such statements are likely to be repeated. *See United States v. Or. State Med. Soc'y.*, 343 U.S. 326, 333 (1952) (indicating that injunctions are to be used "to forestall future violations"). Moreover, an injunction requiring the defendants to issue corrective statements would be premature. *See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993) ("The primary function of a preliminary injunction is to preserve status quo until, upon final hearing, a court may grant full effective relief." (quotation omitted)).

      b.      Reverse palming off

The Lanham Act provides a cause of action for "reverse palming off." *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1241 (8th Cir. 1994). "Reverse palming off is essentially the defendant's unauthorized removal of plaintiff's product's identifying marks before reselling the goods." *Id.*; *see* 15 U.S.C. § 1125(a). "The doctrine includes situations in which a defendant markets another's product that has been only slightly modified and then

16

relabeled." *Pioneer Hi-Bred*, 35 F.3d at 1241; *see also Walker Mfg., Inc. v. Hoffman, Inc.*, 261 F. Supp. 2d 1054, 1071 (N.D. Ia. 2003) (indicating that a reverse palming-off claim may apply when "the plaintiff's proprietary matter was at least alleged to be the 'genesis' for a product ultimately produced by the defendant").

BRI contends that the defendants' E.A.S.E. product is in fact a modified version of UBenefit or was created from proprietary information related to UBenefit and that therefore the defendants have engaged in reverse palming off in violation of the Lanham Act. For reasons discussed above, the Court concludes that BRI has not demonstrated a high likelihood that it can prove that BRI's proprietary matter was the genesis of the defendants' E.A.S.E. product. Accordingly, the Court further concludes that BRI has not demonstrated a high likelihood that it can demonstrate that the defendants have marketed UBenefit or a slightly altered version of UBenefit under the E.A.S.E. name.

BRI also appears to claim that the defendants, during the period when they actively marketed UBenefit for BRI, engaged in reverse palming off by implying that UBenefit itself was proprietary to the defendants. The defendants no longer market the UBenefit product for BRI, so there is no risk of future violations of this type. Accordingly, any such past violation does not warrant a preliminary injunction. *See Dombrowski v. Pfister*, 380 U.S. 479, 485 (1965) (indicating that "injunctive relief looks to the future"); *Oregon State Medical Soc.*, 343 U.S. at 333 ("The sole function of an action for injunction is to forestall future violations.").

4.      *Tortious interference with a business relationship*

BRI claims that Apprize and Reid tortiously interfered with BRI's business relationships through false or misleading communications with UBenefit users and by marketing a competing CRM product improperly based on BRI's trade secrets.  To prevail on a claim for tortious interference with a business relationship, a plaintiff must establish the following elements:

> 1. the existence of a reasonable expectation of economic advantage or benefit belonging to [the plaintiff];
> 2. that [the defendant] had knowledge of that expectation of economic advantage;
> 3. that [the defendant] wrongfully and without justification interfered with [the plaintiff's] reasonable expectation of economic advantage or benefit;
> 4. that in the absence of the wrongful act of [the defendant], it is reasonably probable that [the plaintiff] would have realized his economic advantage or benefit; and
> 5. that [the plaintiff] sustained damages as a result of this activity.

*Harbor Broad., Inc. v. Boundary Waters Broadcasters, Inc.*, 636 N.W.2d 560, 569 (Minn. Ct. App. 2001) (quotation omitted).[6]

As discussed elsewhere, BRI has not demonstrated a strong likelihood that it will prevail on its contract claims, its trade secrets claims, or its claims related to communications by Reid and Apprize to UBenefit users.  BRI has not explained how the defendants' actions might otherwise be wrongful or improper.  *Cf. Nordling v. N. States Power Co.*, 478 N.W.2d 498, 506 (Minn. 1991) ("Interference [with a contract] is improper . . . if it is without legal justification."); *United Wild Rice*, 313 N.W.2d at 633 (indicating that competition carried out through legal means does not constitute tortious interference with prospective contractual relations); *Glass Serv. Co. v. State Farm Mut. Auto Ins. Co.*, 530 N.W.2d 867, 871 (Minn. Ct. App. 1995) (indicating that truthful statements do not constitute a basis for a claim of tortious

---

[6]      Though no party raises the issue, there appears to be some question about whether tortious interference with a business relationship is a valid tort claim under Minnesota law.  *See Harbor Broad., Inc.*, 636 N.W.2d at 569 n.4.

interference with prospective business relations). Accordingly, the Court concludes that BRI has not demonstrated a high likelihood of success on the merits of its tortious interference claim.

5.      *Business defamation*

BRI claims that communications by Apprize and Reid to UBenefit customers were defamatory.  "In order for a statement to be considered defamatory, it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him or her in the estimation of the community."  *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 886 (Minn. 1986).

The Court concludes that BRI has not demonstrated a likelihood of success on its business defamation claim.  As discussed above, to the extent that the September 12 email may have misrepresented precisely which brokers were subject to UBenefit's disclosures to Medica, any error appears likely to have had a negligible impact on BRI's reputation given that BRI did in fact make broad disclosures of broker information to Medica.  BRI has not demonstrated a likelihood that it can prove that any other statement is false.  Moreover, as noted earlier, an injunction prohibiting future false or misleading statements by the defendants is not warranted because BRI has not shown that any such statements are likely to be repeated, *see Oregon State Medical Society*, 343 U.S. at 333 (indicating that injunctions are to be used "to forestall future violations"), and an injunction requiring the defendants to issue corrective statements would be premature, *see Sanborn Manufacturing Co.*, 997 F.2d at 490 ("The primary function of a preliminary injunction is to preserve status quo until, upon final hearing, a court may grant full effective relief."  (quotation omitted)).

6.      *Unjust enrichment*

BRI contends that the defendants have been unjustly enriched by the defendants'

possession and use of BRI's trade secrets and confidential information.  "In order to establish a

claim for unjust enrichment, the claimant must show that another party knowingly received

something of value to which he was not entitled, and that the circumstances are such that it

would be unjust for that person to retain the benefit."  *Schumacher v. Schumacher*, 627 N.W.2d

725, 729 (Minn. Ct. App. 2001) (citing *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544

N.W.2d 302, 306 (Minn. 1996)).  For reasons discussed above, BRI has not demonstrated a high

likelihood that it will prove that the defendants possess trade secrets or confidential information

belonging to BRI to which the defendants are not entitled.[7]

**B.      Irreparable harm**

Irreparable harm is harm for which there is no adequate remedy at law, *Watkins, Inc. v.

Lewis*, 346 F.3d 841, 844 (8th Cir. 2003), so a harm is not irreparable if money damages are

adequate compensation, *see Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir.

1987).  If BRI's allegations are true, failure to grant in injunction would force BRI to continue to

compete against a competitor that is unfairly using BRI's trade secrets.  In that event, BRI would

not only experience lower sales but also suffer loss of market share and the opportunity to

develop goodwill with customers who choose to use the E.A.S.E. product over UBenefit.  These

latter harms qualify as irreparable.  *See Wyeth*, 395 F.3d at 902 (indicating that irreparable harm

may result from misappropriation of trade secrets); *id.* at 902-03 (indicating that loss of market

---

[7]      The Court notes that, at the time of the hearing on this motion, Guertin retained materials related to BRI's trade secrets and confidential information that he had properly acquired during his employment with BRI.  At the hearing, the parties indicated that Guertin would give up possession of these materials, and the parties indicated their intention to come to an understanding about how these materials should be handled.

share may constitute irreparable harm); *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir. 1980) (indicating that Lanham Act violations may be enjoined to prevent consumer confusion). Accordingly, in the absence of an injunction, there is a threat of irreparable harm to BRI, but that threat is limited by the absence of a higher likelihood of success on the merits of BRI's claims.

**C.      Balance of harms**

As discussed above, failure to grant an injunction would expose BRI to the threat of unfair competition and, as a result, harms in the form of lost sales, lost market share, and lost goodwill. Conversely, if BRI's allegations are not true, issuance of the injunction BRI requests would result in lost sales, market share, and goodwill for the defendants. It is significant that, in this latter scenario, the defendants would not be faced with just unfair competition but would instead be prevented from marketing E.A.S.E. altogether, which would magnify the resulting harms. In addition, an injunction prohibiting the defendants from making use of the E.A.S.E. software would likely interfere with their existing contracts with their clients, potentially exposing the defendants to litigation, and Guertin would be precluded from working in his field of expertise. Consequently, without a strong likelihood that BRI will ultimately prevail on its claims, the balance of harms favors the defendants.

**D.      Public interest**

An injunction would potentially serve the public interest in enforcement of contracts, *see Benfield, Inc. v. Moline*, 351 F. Supp. 2d 911, 919 (D. Minn. 2004), safeguarding investments, *see Ikon Office Solutions, Inc. v. Dale*, 170 F. Supp. 2d 892, 898 (D. Minn. 2001), upholding intellectual property rights, *see Control Data Systems, Inc. v. Infoware, Inc.*, 903 F. Supp. 1316, 1326 (D. Minn. 1995), promoting innovation, *see Decade Industries v. Wood Technology, Inc.*, 100 F. Supp. 2d 979, 983 (D. Minn. 2000), and preventing consumer confusion or deception, *see id*.  However, issuance of an unwarranted injunction would contravene a public interest in favor of encouraging, not stifling, market competition.  *See Calvin Klein Cosmetics*, 815 F.2d at 505; *Benfield, Inc.*, 351 F. Supp. 2d at 919.  Without stronger indications about BRI's likelihood of success on the merits of its claims, the Court concludes that the public interest neither favors nor disfavors issuance of an injunction.

### III.   CONCLUSION

Given the potential for great harm to the defendants and the absence of a higher likelihood of success on the merits of its claims, the Court determines that BRI has not met its burden, and, accordingly, a preliminary injunction is not warranted.  Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      Plaintiff's Motion for a Preliminary Injunction [Docket No. 16] is
        DENIED.

Dated:  May 15, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge